IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 22-3125-MDH |
| | ) | |
| ROGERIC HANKINS, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States, by and through its undersigned counsel, respectfully submits the following memorandum in aid of sentencing and requests that the Court sentence Defendant Rogeric Hankins ("Defendant"), a former prisoner transport officer, to 120 months in prison for his sexual assault of J.S., a female pretrial detainee whom the Defendant transported cross-country on a prisoner transport. The Defendant's sexual assault of J.S., which included vaginal rape, deprived J.S. of her constitutional right to bodily integrity, resulted in bodily injury to J.S., and undermined the rule of law. A United States Guidelines Sentence ("Guidelines") of 120 months in prison, to be followed by three years of supervised release, is, therefore, sufficient, but not greater than necessary, to serve the purposes of sentencing, pursuant to 18 U.S.C. § 3553(a).

## I. FACTUAL BACKGROUND

In 2020, the Defendant worked as a prisoner transport officer for Inmate Services Corporation ("ISC"), a private prisoner transport company, located in West Memphis, Arkansas. Local jails and prisons throughout the United States hired ISC to transport individuals who were arrested pursuant to out-of-state warrants. As an ISC prisoner transport officer, the Defendant transported these individuals to the jurisdictions that initially issued the warrants. Further, while

acting in this law enforcement capacity, the Defendant had a duty to uphold the Constitution, and, in so doing, ensure the safety and security of those he transported. The Defendant did the opposite, when he willfully violated his duty of care and J.S.'s constitutional rights.

Specifically, on March 31, 2020, the Defendant and another ISC prisoner transport officer, J.D., picked J.S. up from the Thurston County Jail in Olympia, Washington, to transport her to the Ramsey County Detention Center ("RCDC") in St. Paul, Minnesota, on an outstanding warrant. The transport drove through several states before reaching Minnesota, during which time the officers picked up and dropped off several male inmates in New Mexico and Oklahoma.

On April 2, 2020, while the transport was still in Oklahoma, and when J.S. was the only detainee remaining on the transport, the Defendant learned that they would no longer need to pick up another detainee whom he had expected to transport to Wyoming. The Defendant told J.S. that they would transport her directly to Minnesota, but added that they also now had some free time. Thereafter, the transport stopped at a gas station, where the Defendant allowed J.S. to smoke a cigarette. The Defendant, outside of J.D.'s presence, began to make sexual comments to J.S., including telling her that he noticed that her pants were see-through went he first picked her up in Washington. The Defendant then took over driving the van, so that J.D. could sleep. Thereafter, both J.S. and J.D. fell asleep.

Several hours later, during the early morning hours of April 3, 2020, the Defendant parked the transport van at a rest stop in Joplin, Missouri, and woke J.S. J.D. remained asleep in the van, while the Defendant took J.S. inside the rest stop to use the bathroom. Once inside the rest stop, the Defendant uncuffed one of J.S.'s hands and allowed her to use the women's bathroom. J.S. went into the women's bathroom, while the Defendant waited for her outside.

After J.S. finished using the bathroom, she approached the Defendant so that he could cuff her hands back together. Instead of doing so, the Defendant took J.S.'s uncuffed hand and led her into the men's bathroom, which was empty of other customers. The Defendant told J.S. to go to the furthest stall away from the door. J.S. complied and the Defendant followed her into the stall. The Defendant then began to pull J.S.'s shirt up. J.S. was scared and tried to hold her shirt down, while telling the Defendant to stop. In response, the Defendant told J.S. to be quiet, and then turned her around, bent her over the toilet, and grabbed the back of her hair with one hand. With his other hand, the Defendant began to pull J.S.'s pants and underwear down. J.S. tried to keep her pants and underwear up, but was unable to do so.

The Defendant grabbed J.S.'s hand and pulled it behind her, placing it on his exposed penis. Seconds later, the Defendant yanked J.S. back around and forced her to put her mouth on his penis. Before he could ejaculate, the Defendant, again, turned J.S. back around and, again, bent her over the toilet. From behind, the Defendant penetrated J.S.'s vagina, first with his fingers and then with his penis, telling her, once more, to be quiet. The Defendant ejaculated, as confirmed by a Deoxyribonucleic acid ("DNA") analysis of semen recovered from swabs later taken from J.S.'s body during the Sexual Assault Nurse Examiner ("SANE") exam. During the sexual assault, J.S.'s left knee hit into the toilet, causing a red abrasion, which was later documented during her SANE exam.

After sexually assaulting J.S., the Defendant told J.S. to wait in the bathroom while he left, likely to check that no one was outside. Seconds later, the Defendant returned, cuffed J.S.'s hands together, and walked her back to the van. Once outside the rest stop, he offered J.S. a cigarette and told her he would take care of her. The defendant then woke J.D. and the transport continued.

Sometime later, the Defendant stopped the transport van at yet another rest stop, this time in Owatonna, Minnesota. The Defendant asked J.S. if she needed to use the restroom, and she repeatedly said no. Ignoring her declinations, the Defendant kept asking J.S. whether she needed to use the restroom until she relented. The Defendant then, once again, brought J.S. into the rest stop to use the bathroom, while J.D. remained in the van. Just as before, once inside, the Defendant uncuffed one of J.S.'s hands and J.S. went into the women's bathroom. There, J.S. stuffed toilet paper into her underwear, in the hopes of preserving evidence of the rape. She then walked out of the women's bathroom to where the Defendant was waiting. The Defendant told J.S. to go into the men's bathroom. J.S. told the Defendant that she did not want to and that she was scared. The Defendant repeated his order, and J.S. relented. Again, the Defendant told J.S. to go into the stall furthest from the door. J.S. went into the stall, and, once more, told the Defendant she did not want to do this. Ignoring her, the Defendant began to pull J.S.'s shirt up and to kiss her neck, ear, and mouth. J.S told the Defendant that she was vaginally bleeding, and he finally stopped. The Defendant then cuffed J.S.'s hands back together and brought her back out to the transport van.

When the transport van arrived at the RCDC, in St. Paul, Minnesota, J.S. began to cry. The Defendant told J.S. to wipe her face because crying made her look weak. The RCDC officers told the Defendant to switch J.S.'s handcuffs from in front of her body to behind. As the Defendant switched the cuffs' positioning, he whispered to J.S. that it "hurts him more than it hurts her."

After the Defendant transferred custody of J.S. to the RCDC booking officers, J.S. immediately disclosed the sexual assault to a booking officer, providing details both about the Defendant's rape as well as his attempted sexual assault of her. As mentioned above, analysis of the evidence collected during the SANE exam that J.S. underwent revealed the presence of the

Defendant's DNA on swabs taken from J.S.'s vagina, cervix, perineum, perianal area, right ear, and the right side of her neck. [1]

## II. PROCEDURAL HISTORY & PLEA AGREEMENT

Following a federal investigation into the incident, on November 1, 2022, the United States filed a one-count Bill of Information, charging the Defendant with a felony violation of 18 U.S.C. § 242 (Deprivation of Rights Under Color of Law). (Doc. 4). Specifically, the Information charged that the Defendant, while acting under color of law, willfully deprived J.S. of her fundamental right to bodily integrity, when he penetrated J.S.'s vulva with his penis without her consent and without a legitimate law enforcement purpose, resulting in bodily injury to J.S. (*Id.*).

Pursuant to a plea agreement, the Defendant entered a guilty plea to the Information, that same day, before United States Magistrate Judge David P. Rush. (Doc. 7-10). On November 16, 2022, United States District Judge Douglas Harpool accepted the Defendant's guilty plea. (Doc. 16). Sentencing is scheduled for July 11, 2023. (Doc. 22).

In the plea agreement, made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), the Defendant admitted that he engaged in the sexual misconduct detailed above. (Doc. 10 ¶ 3). He further admitted that J.S. did not consent to any of the sexual conduct and that there was no legitimate law enforcement purpose for it. (*Id.*). The Defendant also agreed that the following Guidelines applied to his case: (1) that the applicable Guidelines section for the offense of conviction is U.S.S.G. § 2H1.1(a)(1), which, in this case directs the Court to the underlying offense guideline from § 2A3.1(a)(2) (Criminal Sexual Abuse), providing for a base offense level of 30; (2) that pursuant to U.S.S.G. § 2A3.1(b)(3), two levels are added because J.S. was in the custody,

---

[1] The DNA lab quantifies the presence of a suspect's DNA in likelihood ratios. All of the swabs collected from J.S.'s body during the SANE exam showed "very strong support" for inclusion of the Defendant as the contributor, with ratios in the octillions and sextillions. That is essentially a match to the Defendant.

care, or supervisory control of the Defendant; and (3) that pursuant to U.S.S.G. § 2H1.1(b)(1)(B), six levels are added because the Defendant was acting under color of law.

In addition, in the plea agreement, the United States agreed that because the Defendant admitted his guilt, accepted responsibility for his actions, and assisted authorities in the prosecution of his own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States and the Court to allocate their resources efficiently, the United States would move at the time of sentencing for a reduction by 3 levels of the Guidelines, pursuant to U.S.S.G. § 3E1.1(b). The United States hereby moves for that reduction.

## III. <u>THE PRESENTENCE INVESTIGATION REPORT</u>

The United States reviewed the Presentence Investigation Report ("PSR") and has no objections to the Guidelines calculations in the PSR. The PSR's Guidelines calculations match the parties' agreed-upon Guidelines calculations in the plea agreement. Thus, the PSR calculated a total offense level of 35 for the offense of conviction. (Doc. 17 ¶ 31). With a criminal history category of I, the Defendant's sentencing range is 168-210 months' imprisonment. (*Id.* ¶ 68). However, because the statutory maximum penalty for the crime to which the Defendant pleaded guilty is 120 months in prison, the recommended Guidelines sentence is the statutory maximum penalty of 120 months. (*See id.* ¶ 68; U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.")).

In addition, the PSR identified no factors that would warrant a departure or variance from the applicable Guidelines sentence of 120 months' imprisonment. (*Id.* ¶ 80).

## IV. <u>A SETENCE OF 120 MONTHS IMPRISONMENT SERVES THE PURPOSE OF THE 18 U.S.C. § 3553(a) FACTORS</u>

When determining a reasonable sentence for a defendant, a court must first consider the applicable Guidelines range. *See United States v. Barraza*, 982 F.3d 1106, 1115 (8th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). Although the Guidelines are advisory, they are the "starting point and the initial benchmark" for federal sentencing. *Gall*, 552 U.S. at 49. Once a court has determined the applicable Guidelines range, it should then consider that range in light of the § 3553(a) factors. *Id.* at 49–50.

In order to arrive at an appropriate sentence, the Court considers the § 3553(a) factors, including: (1) the nature and circumstances of the offense; (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the history and characteristics of the defendant; and (4) adequate deterrence of criminal conduct and the protection of the public. 18 U.S.C. § 3553(a). Section 3553(a) then requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with these purposes. *Id*. Consideration of the § 3553(a) factors here demonstrates that a Guidelines sentence of 120 months' imprisonment is most consistent with these purposes.

**A. A 120-Month Sentence captures Nature and Circumstances of the Offense**

The nature and circumstances of the Defendant's offense conduct support a Guidelines sentence of 120 months' imprisonment. *See* 18 U.S.C. § 3553(a)(1). When a prisoner transport officer sexually assaults someone in his care and custody, the gravity of his conduct cannot be overstated. Here, the nature and circumstances of the offense conduct are particularly egregious. At the time of the offense, J.S. was the only prisoner on the transport van, and the Defendant isolated her further when he took her out of the van—away from his transport partner—and into a stall inside a men's bathroom. Once inside that stall, the Defendant used physical force to make J.S. engage in sex act after sex act with him—the Defendant grabbed J.S.'s hand and pulling it

behind her, made J.S. touch his exposed penis; the Defendant yanked J.S. around, to face him, and made her put her mouth on his penis; the Defendant yanked J.S. back around and bent her over the toilet so that he could penetrate her vagina with his fingers; and the Defendant, keeping J.S. bent over the toilet, penetrated J.S.'s vagina with his penis until he ejaculated. The Defendant did all of this, despite J.S. actively not consenting—literally telling the Defendant to stop. Indeed, as part of his guilty plea, the Defendant admitted that he raped J.S., knowing that she did not consent and that his conduct resulted in bodily injury to her.

There are no words to aptly convey the depravity of the Defendant's conduct and the severe trauma that it caused J.S. Nor is there an adequate sentence that will truly restore J.S.'s sense of safety, dignity, and bodily autonomy, which the Defendant took when he forced her into a men's bathroom stall and raped her. Nonetheless, in structuring the pre-indictment plea agreement that calls for both a recommended and a statutory maximum penalty of 120 months in prison, the United States sought to both capture the severity of the offense conduct and vindicate J.S.'s constitutional rights, while sparing her the uncertainty of trial and the trauma endemic to testifying about the degrading and intimate nature of sexual assault. In addition, in fashioning the plea agreement, the United States also endeavored to recognize that the Defendant took responsibility prior to a grand jury indicting him on all possible charges. A sentence of 120 months' imprisonment is significantly less than the sentence the Defendant would face if convicted after trial, but given his acceptance, it will hold him sufficiently responsible for sexually assaulting J.S. The United States therefore requests that the Court impose a Guidelines sentence of 120 months in prison.

### B. A 120-Month Sentence Reflects the Seriousness of the Defendant's Offense, Promotes of Respect for the Law, and Offers a Just Punishment

A Guidelines sentence of 120 months' imprisonment will also most appropriately capture the significance of the Defendant's conduct, promote respect for the law, and provide for just punishment. *See* 18 U.S.C. § 3553(a)(2)(A). The Defendant's conduct is particularly troubling because, only hours after committing the brutal sexual assault at the Joplin, Missouri rest stop, the Defendant attempted to sexually assault J.S. a second time at the Owatonna, Minnesota rest stop. At the Owatonna rest stop, the Defendant, once again, forced J.S. into a men's bathroom stall, where—despite J.S. saying that she did not want to do this—he began to pull J.S.'s shirt up and to kiss her neck, ear, and mouth. Although, the Defendant thereafter stopped, after J.S. told him she was vaginally bleeding, this uncharged conduct further illustrates the scope of the Defendant's depravity. *See* U.S.S.G. §1B1.4 (Information to be Used in Imposing Sentence); 18 U.S.C. § 3661; *see also United States v. Watts*, 519 U.S. 148, 151–52, (1997) ("Highly relevant-if not essential [to the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (internal quotations omitted); *United States v. Mustafa*, 695 F.3d 860, 862 (8th Cir. 2012) (a court may rely upon uncharged relevant conduct to enhance a sentence).

A Guidelines sentence of 120 months' imprisonment is also necessary to promote respect for the law and to provide just punishment for the offense conduct. *See United States v. Strange*, 370 F. Supp. 2d 644, 650 (N.D. Ohio 2005) ("A society based upon the rule of law cannot suffer the abuse of its laws by those very individuals entrusted with upholding them."). A deviation from the Guidelines would send the message that the sexual abuse of those detained is not deserving of the sanction that Congress and the Sentencing Commission deemed to be just punishment based on the federal courts' collective sentencing expertise accumulated over the decades. *See, e.g.*, *id.* at 651 ("When people who are supposed to enforce our law, the law, end

up violating someone's constitutional rights, it is a very serious thing in a community. [. . . ] The range of imprisonment suggested by the sentencing guidelines both reflects and furthers these considerations.") (internal quotation marks omitted). In comparison, a Guidelines sentence of 120 months would demonstrate that when someone charged with enforcing the law willfully violates the constitutional rights of a person in his care and custody, the legal system will hold him fully accountable for his criminal conduct. *See also*, Judgement and Commitment, Doc. 36, *United States v. Viera,* No. 22-cr-0211-ODW (C.D. Cal. Mar. 20, 2023) (considering what a just punishment would be and sentencing the defendant, a Bureau of Prison corrections officer who violated 18 U.S.C. § 242 by sexually assaulting a female inmate in his custody, resulting in bodily injury, to the Guidelines and statutory maximum sentence of 120 months imprisonment).

**C. History and Characteristics of the Defendant**

The Defendant may argue that his history and characteristics merit a downward departure or variance due his career in law-enforcement and law enforcement-adjacent work and his background, including his family relationships and lack of criminal history. The PSR, commentary to the Guidelines, and caselaw, however, all demonstrate that no downward departure or variance is warranted on these bases.

While the Defendant may seek a downward variance because of his career choices, numerous courts have held that crimes committed by law enforcement officers are ones that courts should treat *more* seriously, not *less* seriously, than other types of criminal acts. *See United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position."); *see also United States v. McQueen*, 727 F.3d 1144, 1157 (11th Cir. 2013) (reversing a below-guidelines sentence

in an excessive force case as "a clear error of judgment," because such a crime is a "particularly serious offense"); *United States v. LaVallee*, 439 F.3d 670, 708 (10th Cir. 2006) ("[I]n many instances, committing a crime while acting under color of law will result in a higher sentence – as it did in this case – rather than a lower sentence.").

This is such a case. It is precisely because the Defendant was acting in a government capacity—transporting J.S., in restraints, in the back of his prisoner transport—that he was in a position to abuse his authority over her, by forcing her into a men's bathroom stall, raping her, and assuming that the coercive nature of their relationship and power imbalance would silence her from reporting his assault. A downward variance for the Defendant's career choices is therefore unwarranted.

Further, the Defendant's background, including his limited criminal history, family ties, and positive childhood, does not provide valid support for a variance. The Guidelines calculation already contemplates a defendant's criminal history or, in this case, lack thereof. *See* U.S.S.G. 5H1.8, Part A; (Doc. 263 ¶¶ 40-41); *United States v. Neil*, 903 F.2d 564, 566 (8th Cir. 1990) (explaining that since the Sentencing Commission already accounts for a defendant's lack of a criminal record in the sentencing table, the defendant's lack of criminal history did not justify a downward departure). Moreover, the Defendant's positive childhood and familial ties are not characteristics unusual enough in their presentation or degree to support the Court varying downward to a below-Guidelines sentence. *See* U.S.S.G. § 5H Commentary (noting that "[g]enerally, the most appropriate use of specific offender characteristics is to consider them not as a reason for a sentence outside of the applicable guideline range but for . . . determining the sentence within the applicable guideline range . . ."). Thus, rather than supporting any downward departure or variance, the Defendant's history and characteristics support a Guidelines sentence.

**D. Deterrence and Protection of the Public from Further Crimes**

The Defendant will never again act with the delegated authority of a law enforcement officer. Nonetheless, the brazen and violent nature of the Defendant's offense conduct, and his evident disrespect of law, shows that he is danger to the public. *See* 18 U.S.C.§ 3553(a)(2)(B)-(C). The Defendant abused his position of authority to isolate and rape J.S., despite knowing that he had mere minutes to complete the assault before someone else came into the men's bathroom or his transport partner woke up and went searching for them. Thus, he acted with impunity, believing that despite the context of this assault and the law, he would get away with his violent, predatory conduct. As such, a sentence of 120 months in prison is necessary to try to ensure specific deterrence and public safety.

In addition to the need for specific deterrence, Congress specifically stated that one of the four purposes of sentencing is "to deter others from committing the offense." S.Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3259. As the Eleventh Circuit held in *United States v. McQueen*, the need for general deterrence in cases of law enforcement officer abuse is particularly compelling, as '[t]he ability to unearth these crimes by law enforcement officers in a prison setting is particularly difficult, [and] . . . extraordinarily lenient sentences in this case sap the goal of general deterrence." 727 F.3d at 1158–59. The Eleventh Circuit's reasoning in *McQueen* is magnified in the setting of sexual assaults committed under color of law during prisoner transports. Few crimes are more difficult to detect than sexual assault where there are rarely independent witnesses and the case is often reliant on the credibility of the victim. This difficulty is compounded in the prisoner transport context where the victim's credibility comes under unfair attack from the outset by virtue of her status as a person with a pending criminal warrant and where the officer offenders have unparalleled control over those they transport. Indeed, even more so than in a prison, on a prisoner transport van

there are few other officers around and no surveillance cameras in the van to witness or record events. Moreover, investigating allegations of prisoner transport officer abuse require investigators to span the country in search of transient victims, witnesses, and evidence. A sentence within the Guidelines will remind others who act under color of law, particularly other prisoner transport officers, of their constitutional obligations to protect those entrusted to their care and to never abuse their power over those in their custody for their own depraved purposes. The United States' requested sentence will thus protect these paramount constitutional rights and promote respect for the law.

## V. **CONCLUSION**

For the aforementioned reasons, the United States respectfully requests that Defendant Rogeric Hankins receive a Guidelines sentence of 120 months' imprisonment, to be followed by three years of supervised release.

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/Laura Gilson*
Laura Gilson
Trial Attorney
U.S. Department of Justice
Civil Rights Division
150 M. Street NE
Washington, DC 20530

## CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following: Ian Lewis and Paul Duchscherer, Assistant Federal Defenders.

s/*Laura Gilson*
Laura Gilson
Trial Attorney